```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
                             LEXINGTON
```

UNITED STATES OF AMERICA,       )
                                )
    Plaintiff,                  ) Criminal Action No. 5:10-149-JMH
                                )
v.                              )
                                ) **MEMORANDUM OPINION and ORDER**
DANTE DEMETRIUS STEWART and     )
DARRYL WILLIAM STEWART, JR.,    )
                                )
    Defendants.                 )
                                )

                    **      **      **      **      **

Defendants Dante Demetrius Stewart and Darryl William Stewart, Jr. have moved the Court to suppress evidence seized from the them following a traffic stop on April 28, 2010 [Dkt. No. 17]. The government has filed a response to the motion [Dkt. No. 20] and the defendants have filed a reply to the government's response [Dkt. No. 21]. Following an evidentiary hearing on January 26, 2011, the undersigned orally announced his decision denying the motion. This Memorandum Opinion and Order will serve to explain the basis for the decision.

                                **FACTS**

The facts are largely undisputed. On April 28, 2010, at approximately 10:22 a.m., Lexington Fayette Urban County Division of Police Officer Ricky Lynn was on routine patrol in a marked unit in the area of Greenwood Avenue. Officer Lynn has been a police officer with the Lexington Fayette Urban County Division of Police for approximately sixteen years. At the time, he was assigned as

the Neighborhood Resource Officer in the Georgetown Street Association area, which includes Greenwood Avenue, a position he had held for approximately seven years.  Based on his assignment, he was very familiar with the specific types of criminal activity in that area.  Specifically, Officer Lynn knew that in the months leading up to April 28, 2010, there had been numerous calls for service to dispatch for various crimes including, but not limited to, disorders with weapons and narcotics, violations which include people seeing firearms or hearing shots fired, and domestic violence calls with weapons.  One recent incident Officer Lynn responded to on April 3, 2010, involved a shooting of an individual several blocks from Greenwood Avenue.  Additionally, Officer Lynn personally responded to calls involving firearms on Greenwood Avenue and the blocks near Greenwood Avenue approximately ten times in the two months prior to the traffic stop in April of 2010.  The primary reason Officer Lynn was on patrol in the area of Greenwood Avenue was in response to a recent increase in complaints of armed drug trafficking activity on Greenwood Avenue by concerned citizens who lived in the area.

While parked on Greenwood Avenue on the day in question, a narrow neighborhood street, he observed a vehicle with three occupants pass by him.  He noticed that the driver and front seat passenger were not wearing seatbelts. Officer Lynn turned his patrol car around to make a traffic stop for this offense, an

undisputed violation of Kentucky law. As he was catching up to the vehicle on Greenwood Avenue, it made a left turn onto Price Road without using a turn signal, a second violation of Kentucky law. Officer Lynn then activated his emergency equipment and made a traffic stop in front of 446 Price Road. When the vehicle stopped, Officer Lynn noticed that the windshield had a crack across the driver's field of vision obstructing the driver's view, yet another violation of Kentucky law. As he walked up to the vehicle to speak with the driver later identified as Darryl Stewart ("Darryl"), Officer Lynn observed an open liquor bottle at the feet of the passenger in the back seat, a fourth violation of Kentucky law.

Officer Lynn asked the occupants for identification. Darryl and the front seat passenger, later identified as Dante Stewart ("Dante"), each provided their driver's license to him but the rear seat passenger provided his identifying information to Officer Lynn verbally. Officer Lynn returned to his patrol car and ran a criminal records check of each occupant using the Fayette County Detention Center database. His check revealed that Dante had a wanton endangerment first degree arrest involving four counts in November of 2009 and had been released from custody in January of 2010. Based upon Officer Lynn's review of the available information and his experience as a recruit training officer, he believed the 2009 incident involved the discharge of a firearm. The records check for Dante also revealed an arrest for possession of a

controlled substance in August of 2009. The records check for Darryl revealed six separate arrests in 2008 for carrying a concealed deadly weapon ("CCDW"). The check further revealed Darryl was currently subject to a domestic violence order and had been arrested on January 14, 2009 for a violation of the domestic violence order. A records check for the rear passenger, later identified as William Higgins ("Higgins"), revealed a drug trafficking conviction in 2006 and a parole violation in 2009.

After conducting the records checks and observing the significant criminal history information involving drugs and weapons pertaining to the three occupants of the vehicle, Officer Lynn became increasingly concerned for officer safety and called for a back up unit to assist him and another officer who had arrived on the scene. He also decided to request a canine unit at that time as he suspected some form of drug activity was afoot. According to the dispatch logs, it was approximately 10:43 a.m. when Officer Lynn requested the canine unit.

Subsequent to requesting back up and canine units, Officer Lynn started the citation for the offenses set forth above. The canine unit arrived at approximately 10:49 a.m at which time Officer Lynn was still preparing the citation. When the canine unit arrived, Officer Lynn asked the occupants to exit the vehicle, a normal course of action when a canine is to be employed. For officer safety, given Darryl and Dante's history of involvement

4

with firearms, he decided to conduct a *Terry* frisk of the three men. He frisked Dante first simply because Dante was the closest man to him. While patting Dante down, he felt a hard object that he knew to be a firearm in Dante's rear pants pocket. Officer Lynn removed the object, a loaded .25 caliber semiautomatic pistol with a round in the chamber. Officer Lynn knew from his earlier records check that none of the three men had CCDW permits. Dante was then arrested.

Virtually within a minute of Officer Lynn finding the firearm in Dante's pocket, the canine was alerted to the odor of narcotics in the car. The canine officer and Officer William Deeb searched the vehicle while Officer Lynn checked to see if the firearm located on Dante was stolen. The search of the vehicle immediately revealed a loaded High Point 9 millimeter semiautomatic pistol under the driver's seat. Officer Lynn then advised Darryl and Higgins of their *Miranda* rights. Both agreed to talk with Officer Lynn. Officer Lynn asked Darryl if the firearm was his. Darryl responded in the affirmative and admitted that it belonged to him. Darryl was arrested and a search of his person incident to his arrest revealed $777.00 and approximately 1.4 grams of suspected powder cocaine. Higgins too consented to a search of his person which revealed $1,300 in cash. Although the vehicle had a strong odor of marijuana, no marijuana or any other controlled substance was ever located in it.

5

Dante and Darryl were transported separately to the Fayette County Detention Center, Dante by Officer Lynn. Although Officer Lynn conducted several unremarkable searches of Dante, he continued to smell the odor of marijuana while in his cruiser. Consequently, Officer Lynn warned Dante that if he had drugs on his person when he went to jail he would be charged with promoting contraband. Dante denied possessing narcotics.

When Darryl and Dante were in the booking area, Officer Lynn again advised them about taking narcotics into the jail. Each denied possession of any narcotics. However, after the officers stepped away for a minute, they observed a small baggy of suspected crack cocaine on the floor of the booking area. Officer Lynn confronted both Dante and Darryl, advising them that the area was videotaped. While doing so, Officer Lynn noticed the zipper on Dante's pants was open. Dante stated the baggy had been in his underwear and he had thrown it on the floor.

Officer Deeb took Darryl to have him strip searched. When Dante observed this, he called Officer Lynn over and told him there was more cocaine in his underwear. Officer Lynn then uncuffed one of Dante's hands, thereupon, Dante removed a bag of what appeared to be crack cocaine from the buttocks area of his underwear. The crack cocaine found on the floor and removed from Dante's underwear was subsequently sent for analysis to the Kentucky State Police Laboratory. It was determined to be 5.79 grams of crack cocaine.

6

DISCUSSION

The first question is whether the traffic stop was legal. It is not disputed that the driver and his front seat passenger were not wearing seat belts when first observed by Officer Lynn on Greenwood Avenue. It is not disputed that the driver of the car failed to utilize his turn signals when turning left from Greenwood Avenue on to Price Road. These actions constitute clear unquestioned violations of Kentucky's civil traffic laws. A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred. *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007). Officer Lynn's observations, thus, gave him a legal basis to stop the vehicle. *See United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) (holding stop for failure to wear seatbelts constitutional); *United States v. Hill*, 195 F.3d 258, 267 (6th Cir. 1999) (holding stop for failing to signal lane change constitutional).

The next question is whether Officer Lynn acted lawfully when he directed all three of the vehicle's occupants to exit the car. "Once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without, violating the Fourth Amendment," because the government's "legitimate and weighty" interest in officer safety outweighs the "'de minimis' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." *Arizona v.*

*Johnson*, 129 S.Ct. 781, 787 (2009) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)). The *Mimms* rule applies to passengers as well as drivers, based on "the same weighty interest in officer safety." Johnson, 129 S. Ct. at 786-87 (internal citation omitted). A passenger is seized, just as the driver is, "from the moment [a car stopped by the police comes] to a halt on the side of the road." *Id.* at 787 (quoting *Brendlin v. California*, 551 U.S. 249, 263 (2007)). A passenger's motivation to use violence during the stop to prevent apprehension for a crime more grave than a traffic violation is just as great as that of the driver. And as "the passengers are already stopped by virtue of the stop of the vehicle," "the additional intrusion on the passenger is minimal." *Id.* (quoting *Maryland v. Wilson*, 519 U.S. 408, 414, 415 (1997)).

Officer Lynn legitimately asked Darryl and Dante (not to mention Higgins) to get out of the car. Traffic stops are "fraught with danger to police officers," and the Fourth Amendment permits officers to conduct an otherwise legitimate stop on their own terms, whether by keeping the driver (and occupants) in the car or by asking them to exit the car, depending on what they perceive as safer. *Id.* at 786 (internal citations omitted). Having stopped the vehicle for multiple traffic violations, Officer Lynn permissibly asked all three occupants to exit the vehicle.

The next question is whether the *Terry* frisk of Dante was constitutional. It is well established that safety concerns are an

integral factor in the *Terry*-stop equation. "A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop, ... and conducting pat-down searches upon reasonable suspicion that they may be *armed and dangerous*." *United States v. Campbell,* 549 F.3d 364, 372 (6th Cir. 2008)(quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005)(emphasis in original). Police officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal citations omitted). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others is in danger." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

The Court in *Shank* examined whether, based on articulable facts taken as a whole, the officers had a reasonable suspicion that Shank presented a danger and might be able to gain immediate control of a weapon from the "lunge area" of the Cadillac. *Id.* at 315. The record in *Shank* showed the officer's suspicion was based upon the following facts: (1) a man was observed driving a car with windows so tinted it was hard to see the movement of occupants

which was a violation of Ohio law; (2) the immediate area, notably the housing development the car was entering, was well-known for violent crime including shootings and considerable drug distribution activity; (3) the driver, when approached, was not wearing a seatbelt – a violation of Ohio law; (4) the car the man was driving did not belong to him; (5) the man had no identification or vehicle registration; (6) the man identified himself as a name the officer recognized as belonging to a person having association with past cocaine dealing activities; (7) the officers knew the distribution of drugs often involves weapons possession and use; and (8) the man appeared agitated and uncooperative upon being frisked. *Id*. at 315-16. Shank argued that his presence in a high crime area was insufficient to justify the officers' attention being drawn to him. Shank was found in the immediate vicinity of a "specific, circumscribed location where particular crimes occur with unusual regularity," specifically, one housing complex known by the officers for drug distribution activity and firearm-related crime. *Id*. at 316. This fact legitimately may be taken into account as a factor in explaining the officers's subsequent acts. *Id*. Similarly in this case, Officer Lynn encountered the vehicle in an area he knew, as a result of recent and frequent personal experience as a patrol officer assigned to the area, had an extraordinary number of recent calls involving drug trafficking and firearms. Officer Lynn had

personally responded to a number of those recent calls.

Further, the officer's review of the committed crimes listed in an appropriate database can also be a factor to show that an officer had the requisite reasonable suspicion for a *Terry* frisk. Based upon the testimony of the officer in *Shank*, the Court found that Shank was known to have "had two previous contacts with Dayton Police Officers, when crack cocaine had been discovered." *Id.* at 316. On one occasion 30 grams had been discovered while 40 grams was found on another. One conviction was from 1997 for possession and the other was from 1998 for trafficking. *Id*. at 316-17. Shank's apparent prior association with crack cocaine distribution, and the known dangerous nature of that activity, constituted additional articulable facts contributing to the officers' suspicion that Shank may have been similarly engaged in drug related activity when he was stopped.

Likewise, Officer Lynn learned from the records checks that Higgins, the rear seat passenger, was on parole for drug trafficking; that Darryl, the driver, had six arrests in 2008 for CCDW; and that Dante had a recent arrest for four counts of wanton endangerment which he believed, from his review of the records, involved a firearm. This knowledge constituted additional articulable facts contributing to Officer Lynn's suspicions that all three occupants may be armed and dangerous.

The seminal question, taking all of the facts and

11

circumstances as a whole and examining the facts as needed "in [an] orderly fashion" while avoiding the error of doing so "in artificial isolation," is whether a "reasonably prudent man in the circumstances" could have believed his safety and that of others was in danger." *Id*. at 318 (internal citations omitted). There is, to be sure, no magic numerosity of facts, a minimum of which may be gleaned in sifting through the circumstances, to "total up" and justify a court's confidence that the officer had reasonable suspicion to frisk or search pursuant to *Terry*. However, based upon the totality of circumstances known to Officer Lynn, this Court finds he reasonably believed the occupants could be armed and dangerous. Thus, the *Terry* frisk of Dante was supported by a reasonable suspicion that he and the other occupants were armed and dangerous and not in violation of the Fourth Amendment.

Assuming *arguendo* that the *Terry* frisk was unconstitutionally flawed, however, the government contends that the inevitable discovery doctrine would have revealed the presence of the firearm in Dante's rear pocket. I agree.

The inevitable discovery doctrine is an exception to the exclusionary rule which "allows unlawfully obtained evidence to be admitted at trial if the government can [show]... that the evidence inevitably would have been acquired through lawful means." *United States v. Garcia*, 496 F.3d 495, 505-06 (6th Cir. 2007)(internal citations omitted). The doctrine applies whenever there are

12

"compelling facts establishing that the disputed evidence inevitably would have been discovered." *Id.* at 506. More specifically, the doctrine applies where the facts indicate that the officers inevitably would have discovered and seized the tainted evidence by following "routine procedures." *Id.* at 505-06. The officers in *Garcia* seized Garcia's pager during a pat down of his person following a lawful traffic stop. The Court held that the seizure of the pager was unreasonable because the *Terry* doctrine permits only a search for weapons, not for evidence in general. *Id*. at 505. The Court upheld the admissibility of the pager, however, because it would have inevitably been lawfully discovered during his lawful arrest. *Id*. Analogous to *Garcia*, the loaded firearm located during the *Terry* frisk of Dante would have been inevitably discovered after the officers found a loaded firearm in the vehicle. That discovery provided an independent basis to conduct a *Terry* frisk of Dante.

In *United States v. Branch*, 537 F.3d 582, 585 (6th Cir. 2008), the defendant was stopped for speeding and issued a warning. The officer asked the defendant if he could ask him a few questions after issuing the warning and also asked for his consent to search the vehicle. *Id*. The officer had a canine unit with him and brought the dog over to the vehicle. *Id.* The dog hit on the vehicle for the presence of narcotics. *Id.* A subsequent search of the vehicle revealed $10,000 in cash. *Id.* at 589.

The Court in *Branch* upheld the pat down performed after the officers discovered the $10,000. The officers did not conduct the pat down search until the dog had alerted to the scent of narcotics at several places on the car and the officer searched and found nearly $10,000 in cash. The officer was entitled to rely on his training and experience that drug dealers frequently carry weapons and thus, the pat down was constitutionally permissible. *Id.*

Here, a pat down after the dog hit on the vehicle for the presence of drugs and the officers discovered a loaded firearm in the vehicle would have been constitutionally permissible. Therefore, even had Officer Lynn waited to conduct the *Terry* frisk of Dante until the canine alerted on the vehicle for the presence of narcotics, the loaded firearm would have inevitably been discovered on Dante during a *Terry* frisk subsequent to officers finding the loaded firearm in the vehicle.

Although the facts enumerated above justified the *Terry* frisk of Dante, the subsequent canine hit on the vehicle for the presence of narcotics within approximately one minute of the frisk provided an independent lawful basis to also conduct a *Terry* frisk of the other occupants. Officers searched the vehicle and immediately recovered a loaded firearm under the driver's seat. Given the presence of the loaded firearm in the vehicle, *Terry* frisks of all three occupants would have been conducted.

Accordingly, **IT IS ORDERED** that Defendants' Motion to Suppress

[Dkt. No. 17] be, and the same hereby is, **DENIED**

This the 27th day of January, 2011.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge